# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| NATHANIEL PRYOR, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-1968 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| MICHAEL CORRIGAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

## MEMORANDUM OPINION AND ORDER

Early one evening in March 2015, Plaintiff Nathaniel Pryor was on his way to the gym with two friends. They rode in a Chevy conversion van, and they planned to get Pryor's gym bag at his house. But they never got a workout. Instead of going to the gym, Pryor ended up at the police station.

An Aurora police officer pulled them over for failure to signal within 100 feet of a stop sign. After seeing the emergency lights on the police car, the van pulled into a nearby driveway and came to a stop. The driver stayed put. But the other two men – including Pryor – got out of the vehicle.

The man in the backseat took off at a full-speed run, prompting one of the officers to chase him on foot. Pryor hopped out of the front passenger seat and began a half-hearted jog down the side of the van, scrambling down the short driveway. A few seconds later, Defendant Michael Corrigan, an officer with the Aurora Police Department, arrived in a second squad car and spotted Pryor making his way toward the street.

Officer Corrigan ran out of his squad car toward Pryor, shouting "Get on the ground!" Pryor stopped moving, stood in front of the first police car, faced the officer, and put his hands up.

Seconds later, Officer Corrigan tackled Pryor to the ground. The officer straddled Pryor as he lay on the pavement. In the next minute, the officer struck Pryor, began to handcuff him, struck him again, and then conducted a search. The officer searched Pryor again after helping him off the ground. Later, another officer, Damien Cantona, allegedly searched him a third time in the back of a transport van.

The officers took Pryor to the police station and charged him with resisting or obstructing a police officer in violation of Illinois law. The state later dropped the charge *nolle prosequi*.

The criminal case was over, but this civil case was just getting started. Pryor ultimately filed suit against Officer Corrigan, Officer Cantona, and a collection of other officers, plus the city of Aurora. He brought six claims: (1) false arrest; (2) excessive force; (3) illegal search; (4) battery; (5) malicious prosecution; and (6) indemnification.

The parties filed cross motions for summary judgment. For the reasons stated below, the Court denies Plaintiff's motion for summary judgment in its entirety. The Court grants in part, and denies in part, Defendants' motion for summary judgment.

## Background

### *The Stakeout*

The incident that culminated in Pryor's arrest didn't start with the van's failure to signal within 100 feet of a stop sign. It started earlier that day, with a tip from an informant. Aurora police received a tip that someone named Raymond Johnson would be "cooking crack cocaine at

a home on Kane Street," and that Johnson "would be in a conversion van."[1] *See* Defs.'
Statement of Facts, at ¶¶ 3–4 (Dckt. No. 84).

Five police officers joined the stakeout of the house on Kane Street, looking for a
conversion van. Two officers, Officer Cantona (the officer who received the tip) and Officer
David Tellner (his partner) sat down the block in their vehicle and surveilled the home from a
distance. *Id.* at ¶ 3. Two other officers, Michael Corrigan and Gregory Christoffel, were
cruising the neighborhood. *Id.* at ¶¶ 4, 6. The final officer – Nathaniel Isaak – was parked
further down Kane Street. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 5 (Dckt. No. 108).
Officer Isaak testified that he was directed to stop the van if there was probable cause to do so.
*See* Defs.' Statement of Facts, at ¶ 5 (Dckt. No. 84)

A purple and white Chevy conversion van later appeared in the neighborhood. The van
contained three men. Terry Mading drove. Plaintiff Nathaniel Pryor sat in the front passenger
seat. Raymond Johnson – the man named in the tip – sat in the back seat. *See* Defs.' Resp. to
Pl.'s Statement of Facts, at ¶¶ 16–17 (Dckt. No. 124). It was early evening. *Id.* at ¶ 14.

It is undisputed that they were "go[ing] to the gym for a workout." *Id.* (admitting that
"plaintiff was picked up by Terry Mading to go to the gym for a workout"). It is also undisputed
that they were first headed to Pryor's home on Fenton Street so that he could grab his gym bag.
*Id.* at ¶ 15 (admitting that the van was "on the way to plaintiff's home . . . so that plaintiff could
retrieve his gym bag").

---

[1] Pryor argues that the tip was unreliable hearsay, but it is not offered for its truth – it is enough that it
was said. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 3–4 (Dckt. No. 108).

### The Traffic Stop

Officer Isaak was the first to spot the van. He observed the van approach the intersection of Kane and Ohio, stop at a stop sign, signal, and then turn right. *See* Defs.' Statement of Facts, at ¶ 6 (Dckt. No. 84).

Officer Isaak testified that the van failed to signal 100 feet before turning, a violation of Illinois law. *Id.* In response, Pryor "cannot admit or deny whether the van put on its signal light more or less than 100 feet before the intersection of Kane and Ohio Streets." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 6 (Dckt. No. 108). On this question, there is evidence on only one side of the ledger. For purposes of summary judgment, it is undisputed that the van failed to signal 100 feet from the stop sign. So there is no issue about whether the traffic stop itself complied with the Fourth Amendment.[2]

Officer Isaak decided to stop the van, so he began to follow it. *See* Defs.' Statement of Facts, at ¶ 6 (Dckt. No. 84). The cruiser driven by Officer Gregory Christoffel (with Officer Corrigan as a passenger) followed Officer Isaak's squad car, trailing by a few blocks. *Id.* at ¶¶ 7–9.

### The Footage

The traffic stop – and the ensuing melee – was caught on video, from the dashcam of both police cars (*i.e.,* the one driven by Officer Isaak, and the one driven by Officer Christoffel with Officer Corrigan as a passenger). Both cameras captured the traffic stop, at different distances. Each camera captured part of what happened next. But neither video captured the

---

[2] "The Fourth Amendment prohibits unreasonable searches and seizures, but the existence of probable cause renders traffic stops and resulting warrantless arrests permissible." *See Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016). "When a police officer reasonably believes that a driver has committed a minor traffic offense, probable cause supports the stop." *Jones v. Elkhart*, 737 F.3d 1107, 1114 (7th Cir. 2013); *see also United States v. Hernandez-Rivas*, 513 F.3d 753, 759 (7th Cir. 2008).

entire interaction. *See* Corrigan Squad Car Video, Defs.' Ex. 17 (Dckt. No. 87-1); Isaak Squad Car Video, Defs.' Ex. 18 (Dckt. No. 88-1).

One squad car was behind the other, so they captured different views. Pryor was in the frame of one of the cameras some of the time, and was in the frame of the other camera at other times. Specifically, Officer Corrigan's dashcam showed Pryor jog down the driveway. Officer Isaak's dashcam caught the tackle. Officer Corrigan's camera showed what happened when Pryor hit the ground.

In their filings, the parties offer different characterizations of what took place after the van pulled over. But the videos tell their own story. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The Court can see – and did see – what happened with its own eyes. Some parts of the video are susceptible to different interpretations (creating an issue of fact), but other parts are not. The Court does not have to accept a gloss on the evidence if the "videotape tells quite a different story." *Id.* at 378–79 (holding that a videotape showed that there was no *genuine* issue of material fact, even though the parties characterized the facts differently); *see id.* at 380–81 ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."); *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) ("When the evidence includes a videotape of the relevant events, the Court should not adopt the nonmoving party's version of the events when that version is blatantly contradicted by the videotape.") (relying primarily on video from dashboard camera of

5

police vehicle); *Holm v. Vill. of Coal City*, 345 F. App'x. 187, 190 (7th Cir. 2009) (considering record evidence rather than party's characterization of evidence). There is no suggestion that the recordings are unreliable or inauthentic.

### *The Approach*

The dashcam from Officer Isaak's squad car shows him following the van. He trailed the van for about 20 seconds, roughly two blocks, before the van pulled over. *See* Isaak Squad Car Video, Defs.' Ex. 18, at 0:20-40 (Dckt. No. 88-1). It is not obvious when, exactly, Officer Isaak turned on his emergency lights. But they appear to reflect off of a street sign during the last 10 seconds (roughly the last block). *Id.* at 0:30-32. The van stopped relatively soon. The driver hit the brakes, turned his signal on, and pulled into a driveway within a few seconds, going at a modest rate of speed. *Id.* at 0:30-40.

Officer Isaak parked his squad car on the street in front of the house. *Id.* at 0:45. The dashcam on Isaak's car still pointed forward (down the street), so the van, which was parking in the driveway to the right, was no longer in the frame.

As soon as the van parked, Raymond Johnson, the man in the back seat, got out of the car and took off running. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 22 (Dckt. No. 124). At that point, Officer Isaak called into his radio in an excited voice, "I got – I got a male bailing out of the house! 1123 Fenton." *See* Isaak Squad Car Video, Defs.' Ex. 18, at 0:45-49 (Dckt. No. 88-1). Defendants suggest that Isaak misspoke, and that he intended to say that a man, Johnson, was bailing out of the "car." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 21 (Dckt. No. 108).

In any case, after radioing in, Officer Isaak immediately dashed out of the squad car and ran after Johnson (who was eventually apprehended). The video shows Officer Isaak streaking

in front of the hood, running toward the van, yelling (presumably at Johnson): "Get on the ground! Get on the ground now! Get on the ground!" *See* Isaak Squad Car Video, Defs.' Ex. 18, at 0:49-53 (Dckt. No. 88-1).

### *The Arrest*

Again, the dashcam from Officer Isaak's squad car was pointed down the street, not toward the house. So it did not capture what happened for the next few seconds. But while that camera was rolling, another camera – in another squad car – was rolling, too.

An unmarked police car driven by Officer Gregory Christoffel followed Officer Isaak's car, trailing by a few blocks. Officer Corrigan rode along as the passenger. That squad car had its dashcam on, too. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 7–9, 38 (Dckt. No. 108). From a distance of a few blocks, the video shows Officer Isaak pull over the van. *See* Corrigan Squad Car Video, Defs.' Ex. 17, at 0:39-52 (Dckt. No. 87-1).

As Officer Corrigan's squad car sped to the scene, the dashcam shows Pryor exit the van. Pryor stepped out, shut the passenger door, and proceeded down the driveway toward the street. *Id.* at 0:54-58. Officer Corrigan's squad car was fast approaching the scene, so Pryor appeared in the distance. But it is clear that Pryor exited the van and ambled down the driveway, shortly after the van came to a stop. *Id.*

Describing Pryor's movement as "running" is a bit of an overstatement. *See* Defs.' Statement of Facts, at ¶¶ 10, 52 (Dckt. No. 84) (claiming that Pryor was "running"). But it wasn't a leisurely walk, either. It was more of a scramble, a shuffle, an awkward lumbering. Pryor didn't want to stay put, but he didn't leave the scene with blazing speed, either.

His feet moved quickly, but he didn't cover a lot of ground. He took about 12 steps in roughly four seconds. *See* Corrigan Squad Car Video, Defs.' Ex. 17, at 0:56 – 1:00 (Dckt. No.

87-1). He didn't get very far. He traveled the length of the van, and then went a short distance down the driveway. *Id.*

If he was trying to get away, it wasn't much of a getaway. For part of the time, he looked back toward the van, or toward the officers pursuing Johnson. *Id.* His movement was awkward – it appears that his pants may have been falling down. *See* Isaak Squad Car Video, Defs.' Ex. 18, at 0:52-54 (Dckt. No. 88-1). He moved noticeably more slowly than the police officers.

As Pryor reached the end of the driveway, Officers Christoffel and Corrigan, who had been trailing Officer Isaak by just a block or two, roared onto the scene. *See* Corrigan Squad Car Video, Defs.' Ex. 17, at 0:50-57 (Dckt. No. 87-1). They pulled behind Officer Isaak's vehicle, and one of the officers yelled, "Go go go go go! He's out, he's out! He's running, he's running!" *Id.*

Pryor slowed to a stop where the driveway met the street, directly in front of the hood of Officer Isaak's squad car. *Id.* at 0:58 – 1:00. That's when Pryor left the frame of Officer Corrigan's dashcam (because Officer Isaak's vehicle was in front, blocking the view). But the dashcam from Officer Isaak's vehicle shows what happened next.

Pryor faced the squad cars. He raised both hands in the air, holding nothing. He didn't move. He then stood still, feet planted, for a few seconds. *Id.* at 0:53-57.

Again, at that point, Pryor was not visible from the dashcam of Officer *Corrigan's* squad car (which was parked behind Officer Isaak's vehicle). But the audio from Officer Corrigan's camera appears to record Officer Corrigan yelling directives at Pryor. A voice rang out: "Get on the ground! Get on the ground!" *See* Corrigan Squad Car Video, Defs.' Ex. 17, at 1:00-06 (Dckt. No. 87-1). The next part sounds like "Down, down . . . down!" *Id.*

The dashcam of Officer Isaak's squad car (*i.e.,* the front car) captured what happened next. As Pryor faced the dashcam, Officer Corrigan came racing toward him and entered the frame. *See* Isaak Squad Car Video, Defs.' Ex. 18, at 0:55 – 1:00 (Dckt. No. 88-1). Pryor was looking in the direction of the officer speeding toward him.

The officer approached Pryor from the front. *Id.* Pryor is a much larger man than Officer Corrigan. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 35 (Dckt. No. 108) (admitting that Pryor weighed about 234 pounds, and Officer Corrigan weighed about 160 pounds).

The officer then ran behind Pryor and put both arms around his midsection. And then the officer took him down. Officer Corrigan used his right leg to sweep Pryor's left leg, and awkwardly took him to the ground. *See* Isaak Squad Car Video, Defs.' Ex. 18, at 0:55 – 1:01 (Dckt. No. 88-1); Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 39 (Dckt. No. 108); Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 27 (Dckt. No. 124).

That's when the pair left the frame of Officer Isaak's dashcam. But they crashed into the frame of Officer Corrigan's camera. The video shows Pryor hit the wet, snow-spotted pavement. He ended up on his side, and then was face down, with Officer Corrigan straddling him on top. *See* Corrigan Squad Car Video, Defs.' Ex. 17, at 1:06-12 (Dckt. No. 87-1).

Pryor asked: "what's going on?" *Id.* at 1:08-09. Officer Corrigan yelled: "don't fight, stop fighting!" *Id.* at 1:08-11. Pryor responded: "I'm not fighting." *Id.* The officer told Pryor to put his hands behind his back. *Id.* at 1:11-13.

Pryor asked again: "Sir, what is the problem?" *Id.* at 1:13-14. It appears from the video that Pryor may not have put his hands behind his back, at least not right away. Pryor asked again: "what is the problem?" *Id.* at 1:13. That's when Officer Corrigan raised his right arm, and slugged him. *Id.* It is not clear from the video where the blow landed.

Officer Corrigan demanded once again that Pryor put his hands behind his back. *Id.* at 1:14-16. Pryor asked a series of questions: "Sir, what is the problem? Sir, what's the problem? What seems to be the problem, sir?" *Id.* at 1:16-20. After the officer said "don't move," Pryor kept asking the question. "Sir, what seems to be the problem? Sir, what seems to be the problem? What seems to be the problem, sir? Sir, what seems to be the problem?" *Id.* at 1:21-34. And so on.

Meanwhile, Officer Corrigan reached for his handcuffs, grabbed Pryor's arms, and placed him in the cuffs. That process took about 30 seconds, more or less. *Id.* at 1:23-57. While putting him in cuffs, the officer struck him again. *Id.* at 1:40. It's unclear if Pryor was fully handcuffed during the second strike. *Id.* After the second strike, Pryor appeared to lay motionless as the officer continued to yell "stop fighting" and "don't move!" *Id.* at 1:39-41.

That entire interaction between Officer Corrigan and Pryor lasted less than a minute. The video shows Pryor exit the van around the 55-second mark of the dashcam video (according to the time stamp), give or take. *Id.* at 0:55. Corrigan tackled Pryor less than 15 seconds later. *Id.* at 1:07. Before the two-minute mark, the officer stood up, and Pryor lay on the ground in handcuffs, asking to get up. *Id.* at 1:56 – 2:00.

About a minute later, Officer Corrigan addressed Pryor's repeated questions about what the problem was. The officer asked: "Why didn't you get on the ground when I told you to get on the ground?" *See id.* at 2:02-03. Pryor responded: "I had got my hands up! You didn't see me with my hands up?" *See id.* at 2:04-06.

After some back and forth, Officer Corrigan explained: "When the police stop a car, and you get out and run from it, that's a problem." *See id.* at 3:45-48. Later, Officer Corrigan added:

"The crazy part is, when you normally get stopped by the police, you don't run from the car. That's the crazy part." *Id.* at 4:04-10.

### The Searches

Officer Corrigan searched Pryor while he lay on the pavement. *Id.* at 2:06 – 4:20. The officer eventually helped Pryor to his feet. *Id.* at 4:32-34. At that point, Officer Corrigan searched Pryor again. *See id.* at 4:34 – 9:16

Pryor argues that each search by Officer Corrigan was unnecessarily intrusive. Pryor testified that, while he was lying on the ground, Officer Corrigan searched inside his pants and "in plaintiff's private area." *See* Pl.'s Statement of Facts, at ¶ 38 (Dckt. No. 98). Officer Corrigan testified that he did not search Pryor's private area. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 39 (Dckt. No. 124) (citing Corrigan Dep., at 192 (Dckt. No. 85-16)).[3]

Pryor also testified that, when he was standing, Officer Corrigan conducted another invasive search, "going into plaintiff's underwear again and touching his genitals." *See* Pl.'s Statement of Facts, at ¶ 42 (Dckt. No. 98). But at deposition, Officer Corrigan denied it. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 43 (Dckt. No. 124).[4]

Defendants point to the video, arguing that it shows "Officer Corrigan search[ing] the pockets in Pryor's jackets and pants. His hands never go near Plaintiff's genitals." *Id.* The video does not shed much light on the issue. It is simply too far away to see exactly what is happening in the search.

---

[3] The paragraph numbers of the filings do not line up here. Paragraph 38 of Plaintiff's Rule 56.1 statement addresses the search of Pryor's private area. *See* Dckt. No. 98. But the response to that paragraph appears in paragraph 39, not paragraph 38, of Defendants' Response. *See* Dckt. No. 124.

[4] The same numbering mismatch appears here, too.

Eventually, the police put Pryor into a transport vehicle and took him to the police station. *Id.* at ¶¶ 45, 48. Pryor testified that, while he was sitting in the back of the vehicle, Officer Cantona searched him too. *See* Pl.'s Statement of Facts, at ¶ 44 (Dckt. No. 98). The third search wasn't captured on video.

Pryor testified that Defendant Cantona "reached into plaintiff's pants and squeezed his testicles so hard through plaintiff's underwear that plaintiff nearly lost consciousness." *See id.* at ¶ 45. But Officer Cantona testified that he never searched Pryor at all. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶¶ 45–46 (Dckt. No. 124).

The officers never found contraband during their searches of Pryor. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 47 (Dckt. No. 124). Similarly, the officers never found contraband in the conversion van. *Id.* And, despite combing the area of the chase, the officers never found contraband in the area where the other passenger – Raymond Johnson – had fled the scene. *Id.*

### *The Charges*

Officer Corrigan brought Pryor to the police station and charged him with "obstructing/resisting a police officer in violation of 720 ILCS 5/31-1." *See id.* at ¶ 48; *see also* Defs.' Ex. 14 (Dckt. No. 85-14). He was not charged with any underlying crimes. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 48 (Dckt. No. 124). The state eventually dismissed the case *nolle prosequi*. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 48 (Dckt. No. 108). The parties dispute why it was dismissed. *Id.*

### The Other Defendants

Pryor brought claims against Officers Corrigan and Cantona. But he also sued nine other officers (Isaak, Christoffel, McNeff, Cornforth, Rios, Bonnie, Ahlgren, Hinterlong, and Weeks) who played more minor roles in the events of that day. He sued the City of Aurora, too.[5]

Pryor is suing six of those nine other officers (Isaak, Christoffel, McNeff, Cornforth, Rios, and Bonnie) on a theory of "failure to intervene" only. So, in the discussion below, when the Court refers to Pryor suing certain defendants on a failure to intervene theory only, the Court is referring to those six defendants.

Two of those officers were introduced in the preceding story. Officer Isaak was part of the surveillance team. He pulled over the van and ran after Johnson when he fled the scene.

Officer Christoffel drove the second squad car, with Officer Corrigan as a passenger. *Id.* at ¶ 30. When that second squad car arrived, Officer Christoffel saw Officer Isaak get out of his vehicle and run after Johnson. Officer Christoffel quickly followed. *Id.* The two officers chased and apprehended Johnson, and the three of them then returned to the scene at 1123 Fenton Street. *Id.* Officer Christoffel never touched or searched Pryor, and he was not involved in any decision to charge Pryor. *Id.*

Officer McNeff arrived on the scene a few minutes after the traffic stop. He joined Officer Bonnie and searched inside the conversion van. *Id.* at ¶ 32. They found Terry Mading (the driver and owner of the van) still inside the van. *Id.*; *see also id.* at ¶ 36. Officer McNeff helped arrest Mading, and then searched for contraband in the area of the chase. *Id.* at ¶ 32.

---

[5] The Court notes that Pryor originally sued unnamed officers of the Aurora Police Department, too. In October 2019, this Court dismissed the claims against the unnamed police officers, without objection. *See* 10/29/19 Order (Dckt. No. 113).

The record includes no evidence of any involvement by Officer Cornforth. *See generally id.*; *see also id.* at ¶ 28; Pl.'s Statement of Facts (Dckt. No. 98) (including no reference to Officer Cornforth, except a statement that he and all other officers acted under color of state law); Pl.'s Statement of Additional Facts (Dckt. No. 109).

Officer Rios drove one of the transport vehicles the same day. *Id.* at ¶ 33. When he arrived on the scene at 1123 Fenton Street, he parked half a block away. *Id.* Officer Rios drove the transport van in which Pryor claims that he was searched. *Id.*

Officer Bonnie reported to the scene when he heard Officer Isaak radio about the traffic stop. *Id.* at ¶¶ 29. By the time he arrived, Officer Corrigan had already handcuffed Pryor. *Id.* Officer Bonnie secured the conversion van. *Id.*

Pryor is suing the remaining three officers (Ahlgren, Hinterlong, and Weeks) for failure to intervene *and* failure to supervise. So, in the discussion below, when the Court refers to Pryor suing certain defendants under both theories, the Court is referring to those three defendants.

Only one of those three officers, Officer Ahlgren, actually appeared on the scene that day. But by the time Ahlgren – a supervising officer – arrived, Pryor was already in handcuffs. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 27 (Dckt. No. 108). He reviewed and approved Officer Corrigan's report. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 51 (Dckt. No. 124).

Officers Hinterlong and Weeks were never on the scene on March 23, 2015. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 31, 34 (Dckt. No. 108). Officer Weeks approved the incident report prepared by Officer Isaak about the arrest. *Id.* at ¶ 31. The record includes no evidence of any involvement by Officer Hinterlong. *See generally id.*; *see also* Pl.'s Statement of Facts (Dckt. No. 98); Pl.'s Statement of Additional Facts (Dckt. No. 109).

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *Anderson*, 477 U.S. at 256.

The Court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *Celotex Corp.,* 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

Summary judgment is the time for a party to put its evidentiary cards on the table. "Summary judgment is 'not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.'" *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)); *see also Caisse Nationale de Credit v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) ("A party seeking to

defeat a motion for summary judgment is required to 'wheel out all its artillery to defeat it.'")
(citation omitted).

The same principles apply when parties file cross motions for summary judgment.  The
Court treats the cross motions "separately in determining whether judgment should be entered in
accordance with Rule 56."  *Marcatante v. City of Chicago*, 657 F.3d 433, 439 (7th Cir. 2011).
The Court construes all facts and draws all reasonable inferences in favor of the party against
whom the motion was filed.  *See Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*,
849 F.3d 355, 361 (7th Cir. 2017); *see also Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d
405, 416 (7th Cir. 2019) ("Each cross movant for summary judgment bears a respective burden
to show no issue of material fact with respect to the claim.").  When reviewing Plaintiff's motion
for summary judgment, the Court views the evidence in the light most favorable to Defendants,
and vice versa.

## Discussion

The complaint includes six counts, advancing an assortment of claims against eleven
individual Defendants, plus the City of Aurora.  Pryor advances three claims under 42 U.S.C.
§ 1983:  false arrest (Count I), excessive force (Count II), and illegal search (Count III).  He
brings two claims under Illinois law:  battery (Count IV) and indemnification (Count VI).  He
brings the other claim, malicious prosecution (Count V), under both federal and state law.

Pinning down who Pryor sued for what – and who moved for summary judgment on what
claims against which parties – takes a little doing.  So, the Court offers the following summary in
the hope of providing clarity for the analysis that follows.

For Counts I (false arrest) and II (excessive force), all eleven officers are defendants.  *Id*.
at ¶¶ 33, 41.  Officer Corrigan is the primary defendant.  *Id*. at ¶¶ 33, 38.  Pryor sued Officer

Cantona plus six officers for failure to intervene, and he sued three officers for both failure to intervene and failure to supervise. *Id*. at ¶¶ 34, 35, 39, 40.

For Count III (illegal search), only eight of the eleven officers are defendants. Officer Corrigan is the primary defendant for the two searches that he performed. *Id*. at ¶ 43. Officer Cantona is the primary defendant for the search that he allegedly conducted by the back of the transport van. *Id*. Pryor is also suing Officers Cantona and Corrigan for failure to intervene in the searches that they did not conduct themselves, and he is suing the six "failure to intervene" defendants for failure to intervene as well. *Id*. at ¶¶ 45, 46.

Count IV (battery) is based on Pryor's allegations in Count II (excessive force) and Count III (illegal search). Again, Pryor is suing eight of the eleven officers (Corrigan, Cantona, and the six "failure to intervene" officers), but this time he's suing all eight, not just Corrigan and Cantona, directly for battery. *Id*. at ¶¶ 48, 49. He also brings a claim against the City of Aurora on a theory of *respondeat superior*. *Id*. at ¶ 51.

Count V (malicious prosecution) is really two claims: a claim under state law, and a claim under federal law. Here, Officer Corrigan is the primary defendant. *Id*. at ¶¶ 52, 56. Pryor sued Officer Cantona plus the six "failure to intervene" defendants for failure to intervene, and sued the three "failure to intervene"/"failure to supervise" defendants for failure to intervene and failure to supervise. *Id*. at ¶¶ 56, 57. Pryor also advanced a claim against the City of Aurora on a theory of *respondeat superior*. *Id*. at ¶ 60.

Finally, for Count VI (indemnification), only the City of Aurora is a defendant. *Id*. at ¶ 64.

The parties filed cross motions for summary judgment. Defendants moved for summary judgment on Counts I through V with respect to all defendants. *See* Defs.' Mem. in Support of Mtn. for Summ. J., at 1–2 (Dckt. No. 86).

Pryor also seeks summary judgment on Counts I through V, but only with respect to liability, and only with respect to five of the twelve defendants: Officers Corrigan and Cantona (the two primary defendants), Isaak and Christoffel (two of the "failure to intervene" defendants), and Ahlgren (one of the "failure to supervise" defendants). *See* Pl.'s Mtn. for Partial Summ. J., at 2 (Dckt. No. 97).

To get down to brass tacks, on Count I, Pryor moves for summary judgment against all five of those defendants. *Id.* On Count II, he moves for summary judgment against Officer Corrigan only. *Id.* On Count III, he moves for summary judgment against Officers Corrigan and Cantona only. *Id.* On Count IV, he moves for summary judgment against Officers Corrigan and Cantona, and the City of Aurora only. *Id.* And on Count V, he moves for summary judgment against Officers Corrigan and Ahlgren, and the City of Aurora only. *Id.*

Neither party moved for summary judgment with respect to Count VI, the indemnification claim. *Id.*; Defs.' Mtn. for Summ. J., at ¶ 14 (Dckt. No. 83).

For each Count, Defendants primarily argue that qualified immunity shields the officers from liability. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citation omitted); *see also Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009). The qualified immunity analysis involves a two-step inquiry: (1) did the defendants violate a constitutional right? and (2) was the constitutional right clearly

18

established at the time the official acted?  *See Baird*, 576 F.3d at 344.  The Court has the discretion to address either factor first.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

With that windup, the Court addresses each claim in turn.

## I.     False Arrest (Count I)

First, Pryor brings claims against all eleven officers for false arrest.  *See* Cplt., at ¶ 41 (Dckt. No. 1).  All parties have moved for summary judgment.  Defendants have moved for summary judgment with respect to all eleven officers (that is, Officer Corrigan and ten others).  *See* Mtn. for Summ. J., at ¶¶ 8, 9 (Dckt. No. 83).  Plaintiff has moved for summary judgment against five of the eleven officers.  *See* Pl.'s Mtn. for Partial Summ. J., at 2 (Dckt. No. 97).

Pryor's claims against the other ten officers are entirely dependent on his claim against Officer Corrigan (the officer who actually completed the arrest), so the Court addresses the claims against that officer first.

### A.     False Arrest Claim Against Officer Corrigan

Pryor argues that Officer Corrigan violated his Fourth Amendment rights when he arrested him because, at the moment of arrest, Officer Corrigan lacked probable cause to believe that Pryor had committed a crime.  Officer Corrigan argues that he did have probable cause to believe that Pryor had committed a crime when he arrested him – namely, the crime of resisting arrest or obstructing a police officer's authorized actions.  Officer Corrigan also argues that his actions are protected by qualified immunity.  *See* Defs.' Mem. in Supp. of Mtn. for Summ. J., at 4 (Dckt. No. 86).

To resolve the dispute, the Court must determine when the officer placed Pryor under arrest, and whether he had probable cause for the arrest at that point.

### 1.    The Moment of Arrest

A seizure rises to the level of an arrest when "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *See Ochana v. Flores*, 347 F.3d 266, 270 (7th Cir. 2003) (quoting *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999)). "An arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphasis in original); *see also McCoy v. Harrison*, 341 F.3d 600, 605 (7th Cir. 2003) (interpreting *Hodari D*, 499 U.S. at 624–26, 629). The inquiry is an objective one, and "presupposes an *innocent* person." *See United States v. Drayton*, 536 U.S. 194, 202 (2002) (emphasis in original; citation omitted).

Pryor argues that he was arrested when Officer Corrigan "slammed [him] to the pavement." *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 5–6 (Dckt. No. 110). There is no doubt that Pryor was under arrest at that point. A tackle is the "application of physical force," however slight, and then some. *See Hodari D.*, 499 U.S. at 626.

In fact, Pryor was actually arrested earlier, when he raised his hands in the air and submitted to the authority of the police. At that point, Officer Corrigan had exhibited an "assertion of authority" – roaring up to the scene, flashing the lights of his cruiser, running toward Pryor, and yelling "Get on the ground! Get on the ground!" and "Down down!" *See* Corrigan Squad Car Video, Defs.' Ex. 17, at 1:00-06 (Dckt. No. 87-1). Pryor stopped and raised both his hands in the air. *See* Isaak Squad Car Video, Defs.' Ex. 18 at 0:54-57 (Dckt. No. 88-1).

That act constituted submission. No reasonable person in that position would have felt "'free to decline the officer's request or otherwise terminate the encounter.'" *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994) (quoting *Florida v. Bostick*, 501 U.S. 429, 435–

36 (1991)).  The squad cars, the emergency lights, and the shouting officers made it unmistakably clear that he wasn't free to go anywhere.

In the end, it is not material whether Pryor was arrested when he was tackled, or earlier. By the moment of the tackle, it was unmistakably clear that he wasn't free to leave.

### 2. Probable Cause at the Moment of Arrest

The next question is whether Officer Corrigan had probable cause to place Pryor under arrest.

"The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).  But "'[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt,'" and "the belief of guilt must be particularized with respect to the person to be searched or seized."  *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).  To determine whether an officer had probable cause for an arrest, the Court "examine[s] the events leading up to the arrest, and then decide[s] 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause."  *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

"The existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer for false arrest or false imprisonment."  *See Abbott v. Sangamon Cty.*, 705 F.3d 706, 713–14 (7th Cir. 2013) (citing *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006)); *see also Jackson v. Parker*, 627 F.3d 634, 638 (7th Cir. 2010).  "Whether probable cause exists at the time of an arrest depends on whether 'the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution,

21

in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Brooks v. City of Aurora*, 653 F.3d 478, 484 (7th Cir. 2011) (quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009)). "As the term suggests, probable cause deals not with hard certainties but with probabilities." *Abbott*, 705 F.3d at 714.

The probable cause inquiry is an objective one. The officer's "subjective state of mind and beliefs are irrelevant." *Id.* (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). The Court must look to the officer's knowledge at the time and determine whether those facts and circumstances created probable cause for an arrest, viewed from the standpoint of an "objectively reasonable police officer." *Id.* (quoting *Pringle*, 540 U.S. at 371). Probable cause "'depends not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person *in the position of the arresting officer* – seeing what he saw, hearing what he heard.'" *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 457 (7th Cir. 2010) (quoting *Mahoney v. Kesery*, 976 F.2d 1054, 1057 (7th Cir. 1992)) (emphasis in original).

Before considering whether Officer Corrigan had probable cause to arrest Pryor, it is worth a brief pause to bear in mind three principles.

First, "[g]enerally, the decision to stop a car is reasonable, and comports with the Fourth Amendment, 'where the police have probable cause to believe that a traffic violation has occurred.'" *United States v. Simon*, 937 F.3d 820, 828 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 824 (2020) (quoting *Whren*, 517 U.S. at 810). "If an officer reasonably thinks he sees a driver commit a traffic infraction," that reasonable belief "is a sufficient basis to pull him over without violating the constitution." *Id.* at 829 (holding that traffic stop was supported by probable cause; the district judge found that the officers credibly testified that the defendant failed to signal sufficiently before turning). Officer Isaak pulled the conversion van over when he observed the

driver's failure to signal within 100 feet of a turn. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 6 (Dckt. No. 108). Pryor offers no evidence to dispute this fact; he simply says that he "cannot admit or deny whether the van put on its signal light more or less than 100 feet before the intersection of Kane and Ohio Streets." *Id.* So the traffic stop itself was not problematic here for Fourth Amendment purposes.

Second, during a traffic stop, an officer has the right to detain the *passengers* as well as the *driver. See Arizona v. Johnson*, 555 U.S 323, 333 (2009) ("In sum . . . a traffic stop of a car communicates to a reasonable passenger that he or she is not free to terminate the encounter with the police and move about at will."). Pryor – a passenger in the conversion van – ran out of a vehicle that a police officer had just pulled over in a traffic stop. The police told Pryor to stop; Pryor decided to go.

Third, in the situation where a passenger like Pryor *flees from* a lawful traffic stop, Illinois courts have found that "he is attempting to avoid detention by an officer who has a valid right to seize him." *See People v. Johnson*, 408 Ill. App. 3d 107, 348 Ill. Dec. 695, 945 N.E.2d 2, 12 (2010); *see also Cacciola v. McFall*, 2011 WL 13128620, at *6 (C.D. Ill. 2011) ("[A]s soon as the Plaintiff [a driver pulled over for a minor traffic violation] began to run from the Defendant, the Defendant had probable cause to arrest him for resisting or obstructing a police officer."). Because the police officer has the right to detain a passenger involved in such a stop, "flight by that passenger has been held to constitute an offense of obstruction of a peace officer, which constitutes a Class A misdemeanor." *See People v. Johnson*, 945 N.E.2d at 12 (citing cases). Flight following a lawful stop is obstruction, because fleeing is the opposite of stopping.

With those principles in mind, the question is whether Officer Corrigan had probable cause to arrest Pryor for obstructing or resisting a police officer. Defendants admit that there

23

was no probable cause to arrest Pryor for anything else. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 10 (Dckt. No. 124) ("Defendants admit that they do not claim they had probable cause to arrest Plaintiff for any underlying charge, only for obstructing/resisting a peace officer."). He wasn't charged with anything else, either. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 46 (Dckt. No. 108); *see also* Defs.' Ex. 14 (Dckt. No. 85-14) (charging Pryor with "obstructing/resisting a peace officer" in violation of 720 ILCS 5/31-1).

Defendants argue that Officer Corrigan had probable cause to believe that Pryor was violating 720 ILCS 5/31-1, which makes it a crime to resist or obstruct a police officer. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 10 (Dckt. No. 124); *see also* 720 ILCS 5/31-1 ("A person who knowingly resists or obstructs the performance by one known to the person to be a peace officer . . . of any authorized act within his or her official capacity commits a Class A misdemeanor."). The Court agrees.

In Illinois, a person resists or obstructs a police officer by committing a "physical act of resistance or obstruction . . . that impedes, hinders, interrupts, prevents, or delays the performance of the officer's duties, such as by going limp or forcefully resisting arrest." *See Brooks*, 653 F.3d at 484 (quoting *People v. Agnew-Downs*, 404 Ill. App. 3d 218, 344 Ill. Dec. 24, 936 N.E.2d 166, 173 (2010)). Fleeing a lawful traffic stop constitutes resistance or obstruction. *See Cacciola*, 2011 WL 13128620, at *6; *People v. Johnson*, 945 N.E.2d at 12.

When Officer Corrigan arrived on the scene, he knew that Pryor had been pulled over as part of a traffic stop. And he observed Pryor get out of the van, and head down the driveway toward the street. A reasonable police officer could have believed that Pryor was fleeing the scene. Pryor's actions, caught on videotape, support such a conclusion: when Pryor gets out of

the car, he is looking around, and it appears that he is trying to get away from the vehicle. *See* Corrigan Squad Car Video, Defs.' Ex. 17, at 0:55 – 1:00 (Dckt. No. 87-1).

True, Pryor didn't make it very far before Officer Corrigan caught up to him. But his failure to actually escape doesn't mean that Officer Corrigan had to conclude that his intentions were pure. Officer Corrigan had probable cause to arrest Pryor for fleeing the traffic stop. *See People v. Johnson*, 945 N.E.2d at 12.

Because the Court concludes that the arrest was lawful, it need not address the qualified immunity defense. Defendants' motion for summary judgment on the false arrest claim against Officer Corrigan is granted. Plaintiff's motion for summary judgment on the false arrest claim against Officer Corrigan is denied. A reasonable officer in Officer Corrigan's position could have believed that probable cause existed to arrest Pryor for obstructing or resisting a peace officer in violation of section 5/31-1.

### B. False Arrest Claims Against Other Defendants

Pryor's claims against the other ten officers, which rest on theories of failure to intervene or supervisory liability, depend on a finding that the underlying arrest by Officer Corrigan was unlawful. Because the Court concludes that Officer Corrigan did not commit any underlying constitutional violation in the arrest, the Court grants Defendants' motion for summary judgment in favor of the other officers, and denies Plaintiff's motion for summary judgment against the other officers.

## II. Excessive Force (Count II)

Next, Pryor brings claims against all eleven officers for the use of excessive force. *See* Cplt., at ¶ 41 (Dckt. No. 1). Again, each side moved for summary judgment. Plaintiff moved for summary judgment against Officer Corrigan only, and Defendants moved for summary judgment

25

in favor of all eleven officers. And again, Pryor's claims against the other ten officers are entirely dependent on his claim against Officer Corrigan (who completed the arrest), so the Court addresses the claim against him first.

### A.    Excessive Force Claim against Officer Corrigan

Pryor alleges that Officer Corrigan used excessive force during the arrest in violation of the Fourth Amendment. He rests his claim on the tackle and on the two blows that Officer Corrigan delivered when Pryor was on the ground. *See* Pl.'s Mem. in Supp. of Mtn. for Summ. J., at 10–12 (Dckt. No. 100).

Under the Fourth Amendment, a police officer may use some degree of force when making a lawful arrest. *See Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009) ("An officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest . . . ."). But a seizure must be reasonable, as the text of the Fourth Amendment commands. *Id.* An officer may not use "greater force than [is] reasonably necessary to make the arrest," that is, an officer may not use excessive force. *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009) (quoting *Lester v. City of Chicago*, 830 F.2d 706, 713 (7th Cir. 1987)).

To determine whether an officer used "greater force than was reasonably necessary," the Court asks whether, "in light of the facts and circumstances that confronted the officer (and not 20/20 hindsight), the officer behaved in an objectively reasonable manner." *Padula v. Leimbach*, 656 F.3d 595, 602 (7th Cir. 2011) (quoting *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010)). As part of that inquiry, the Court "must consider all the circumstances," including "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to

26

evade arrest by flight." *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

To properly account for the "fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation," *Graham,* 490 U.S. at 397, the Court "give[s] considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations." *Baird*, 576 F.3d at 342.

The Court will address the tackle, and then the punches.

### 1.      The Tackle

The Court begins with Officer Corrigan's initial interaction with Pryor, when he tackled him to the pavement, after Pryor had raised his hands in apparent surrender. Officer Corrigan argues that this action is protected by qualified immunity, while Pryor argues that it was clearly excessive in violation of the Fourth Amendment. Here, the video from the two dashcams shows what happened. There is no genuine dispute about the facts.

District courts have discretion to address the second prong of the qualified immunity analysis – whether the right at issue was "clearly established" at the time of the incident – without first determining whether a constitutional violation occurred. *See Pearson*, 555 U.S. at 236. Once a defendant raises the defense of qualified immunity for an alleged violation of a constitutional right, the plaintiff bears the burden to demonstrate "that the right is clearly established such that 'the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *See Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (quoting *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000)). To satisfy this standard, the right must have been clearly established "in a particularized sense,

rather than at a high level of generality." *Alicea v. Thomas*, 815 F.3d 283, 291 (7th Cir. 2016); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").

Pryor does not identify any such precedent. He correctly states the general proposition that "Plaintiff had a clear right to be free from excessive force under the Fourth Amendment." *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 9–13 (Dckt. No. 110). But that's the type of "high level of generality" that does not pass muster. *Alicea*, 815 F.3d at 291. Pryor needed to come forward with a more specific application of that general principle. But he came up empty.

The parties discuss two cases, *Johnson v. Scott*, 576 F.3d 658 (7th Cir. 2009), and *Hollingsworth v. City of Aurora*, 2014 WL 7204083 (N.D. Ill. 2014). But neither case presents a clean parallel to the facts present here.

In both *Johnson* and *Hollingsworth*, officers were granted qualified immunity for tackling suspects. But both cases involved violent underlying crimes. *See Johnson*, 576 F.3d at 660 (noting that "there were two serious crimes at issue: a shooting and reckless flight from the police in a vehicle"); *Hollingsworth*, 2014 WL 7204083, at *3 (robbery). Both *Johnson* and *Hollingsworth* involved longer police chases, too. *See Johnson*, 576 F.3d at 661 (characterizing Johnson's attempt to evade police in his car and on foot as "reckless and determined"); *Hollingsworth*, 2014 WL 7204083, at *4 (describing Hollingsworth jumping out of a fleeing vehicle). Here, the police had no reason to believe that Pryor was violent, and the chase (such as it was) wasn't exactly high speed.

The more fundamental problem for Pryor is that the cases do not clearly establish when tackling is impermissible. Basically, Pryor's argument goes something like this: (1) tackling

was acceptable in *Johnson* and *Hollingworth*; (2) this case is not like *Johnson* and *Hollingsworth*; so therefore (3) tackling was unacceptable here. But that conclusion does not follow at all. The fact that *Johnson* and *Hollingworth* fell on the "tackling is OK" side of the line does not reveal much about where, exactly, the line is. *Johnson* and *Hollingworth* could have cleared the line by a wide margin.

To satisfy his burden, Pryor needed to show that it is "beyond debate" that the tackle was unacceptable here. *See al-Kidd*, 563 U.S. at 741. That is, he must establish that, in cases similar to this one, tackling is clearly a constitutional violation. Neither *Johnson* nor *Hollingsworth* establishes anything of the sort.

Plus, *Johnson* and *Hollingsworth* are not isolated examples – plenty of other courts in this Circuit have granted officers qualified immunity for claims involving tackling during an arrest. *See, e.g.*, *Rodriguez v. City of Berwyn*, 2018 WL 5994984, at *12 (N.D. Ill. 2018) (granting qualified immunity to an officer for a tackle during an arrest where the suspect attempted to close a door on the officer during the arrest); *Findlay*, 722 F.3d at 899 (granting qualified immunity for an officer's tackle where the plaintiff did not identify an analogous case); *Boothe v. Sherman*, 190 F. Supp. 3d 788, 799–800 (N.D. Ill. 2016) (granting qualified immunity to an officer for his "takedown" used to effectuate arrest of an initially resistant suspect). Pryor does not come up with any case law on the other side of the ledger.

Instead, the best that Pryor can do is to raise some questions about whether Officer Corrigan's use of force here was permissible when analyzed under the *Graham* factors. But qualified immunity protects officers in such circumstances. *See Mullenix v. Luna*, 577 U.S. 7, 18

(2015) ("[Q]ualified immunity protects actions in the 'hazy border between excessive and acceptable force.'") (citation omitted).

In the end, Pryor has not shown that it was clearly established at the time of the tackle that such force was excessive under the Fourth Amendment. As a result, Officer Corrigan's tackle is protected by qualified immunity. The Court accordingly grants Officer Corrigan's motion for summary judgment and denies Pryor's cross motion for summary judgment on this portion of Pryor's excessive force claim.

### 2. The Punches

Pryor also argues that Officer Corrigan used excessive force by hitting him twice when he was on the ground. *See* Cplt., at ¶ 38 (Dckt. No. 1); Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 10–11 (Dckt. No. 110).

The parties disagree (and present conflicting evidence) about three important facts.

First, they disagree about whether Pryor was struggling with Officer Corrigan when the officer hit him twice. Pryor testified that he was docile, and that he "did not move around or attempt to resist defendant Corrigan." *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 35 (Dckt. No. 124). Defendants deny that assertion, pointing to a 43-second portion of video which shows the tackle, and subsequent strikes. *Id.* (citing Corrigan Squad Car Video, Defs.' Ex. 17, at 1:08-51 (Dckt. No. 87-1)). In the Court's view, the video is subject to both interpretations: a reasonable jury could watch the video and conclude that Pryor was docile, or that Pryor was resisting in some way during both strikes. *See* Corrigan Squad Car Video, Defs.' Ex. 17, at 1:08-51 (Dckt. No. 87-1).

At 1:08, the video shows Pryor hit the ground on his right side. *Id.* at 1:08. Immediately after Pryor hits the ground, he quickly flips from his side to his back and, by the look of things,

appears to try to sit up. *Id*. at 1:08-12. In response, Officer Corrigan jumps on Pryor, straddles him, flips Pryor onto his stomach and yells "get on the ground." *Id*. By 1:12, just seconds later, Pryor is on his stomach, perhaps a little off the ground, with Officer Corrigan laying on Pryor's back, straddling him. *Id*. Pryor is propped up on his right arm. *Id*.

At that point, Officer Corrigan yells "put your hands behind your back," but Pryor does not appear to move his right arm, and his left arm is not in view. *Id*. at 1:12-14. So, at 1:14, Officer Corrigan strikes Pryor. *Id*. Pryor's right arm then gives out, and he falls back to the ground. *Id*. At that point, the officer grabs Pryor's right arm (which is now hovering above the ground, not propping him up), stands up over Pryor, then grabs his left arm, and holds both arms behind Pryor's back, a process that takes no more than five seconds. *Id*. at 1:14-20. Whether Pryor's actions (sitting up, and not putting his arm behind his back) could be construed as resisting is a question for the jury.

The second strike occurs about 25 seconds later. *Id*. at 1:39. At that point, Officer Corrigan appears to still be in the process of handcuffing Pryor (the Court addresses whether Pryor was fully handcuffed at that point below). *Id*. Pryor keeps asking him "sir, what seems to be the problem?" as Officer Corrigan tries to handcuff him and answer a radio call. *Id*. at 1:20-37. Just before the second strike, at approximately 1:37 or 1:38, Pryor appears to flinch or make some kind of movement. *Id*. at 1:36-39. In response, Officer Corrigan hits him again and yells "stop fighting!" *Id*. at 1:39-40. Whether Pryor's repeated questions, and the motion he made before the officer hit him, count as resisting is, again, a question for the jury.

Second, the parties disagree about whether Pryor was handcuffed when Officer Corrigan hit him the second time. Pryor testified that "[w]hile defendant Corrigan was on top of plaintiff,

31

he forcefully struck him twice . . . one of these times was after plaintiff was already in handcuffs." *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 31 (Dckt. No. 124). Again, Defendants deny that assertion, stating "[p]laintiff was not in handcuffs for either of the strikes." *Id.* Both parties cite to the video. Again, the Court finds that the video does not shed definitive light on the issue. *See* Corrigan Squad Car Video, Defs.' Ex. 17, at 1:08-55 (Dckt. No. 87-1).

Officer Corrigan appears to reach for his handcuffs for the first time at 1:22, after he's got both of Pryor's hands behind his back. *Id.* at 1:22. At 1:26, the officer bends down with the handcuffs, and at 1:29, there's a clicking sound, which might be the click of a first handcuff fastening around Pryor's wrist. *Id.* at 1:26-29. Just seconds later, at 1:31, Officer Corrigan receives a radio call, raises his right hand to respond, and says what sounds like "I have one in custody." *Id.* at 1:30-35. Pryor asks again, "Sir, what seems to be the problem," and at 1:39, Officer Corrigan strikes Pryor again. *Id.* at 1:35-39. Just then, somewhere between 1:38 and 1:40, there's another sound, which might be the click of a second handcuff (but it is less than clear). *Id.* at 1:38-40. From 1:40 to 1:55, Officer Corrigan continues to do something with both hands on or near Pryor's back. *Id.* at 1:40-55. It's hard to tell what exactly he is doing.

Officer Corrigan testified that he "struck Pryor a second time when Pryor's right hand slipped the cuffs," because once his cuff slipped, "Pryor immediately drove his hands down between his skin and his clothing," and the officer was "afraid that Pryor was retrieving either a weapon or contraband." *See* Defs.' Statement of Facts, at ¶ 56 (Dckt. No. 84). If so, it is not obvious from the video. In sum, from the video, it's simply too hard to tell whether the second handcuff fastened before or after the second strike.

Third, the parties disagree about what part of his arm Officer Corrigan used to hit Pryor, and where Officer Corrigan hit Pryor on his body. Pryor testified that the officer "struck him

twice on the right side of his face with his fist." *See* Defs.' Resp. to Pl.'s Statement of Facts, at

¶ 31 (Dckt. No. 124). Officer Corrigan testified that on the first strike he "used the inside of his

forearm to strike Plaintiff in the face," and on the second strike he "used his palm to strike the

inside of Plaintiff's forearm." *Id.* Again, the video isn't clear. The video shows the encounter

from behind, so it's simply too difficult to see the shape of Corrigan's hands, or where they hit

Pryor. *See* Corrigan Squad Car Video, Defs.' Ex. 17, at 1:08-55 (Dckt. No. 87-1).

A few facts are undisputed. Officer Corrigan tackled Pryor and straddled him with the

intention of placing him in handcuffs. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 35 (Dckt.

No. 124). Officer Corrigan arrested Pryor for committing a misdemeanor: obstructing/resisting

a peace officer. *Id.* at ¶ 12. Pryor was unarmed, and "never tried to hit or strike the officers."

*Id.* at ¶ 25. The video also shows that while he's on the ground, Pryor does not do anything

objectively violent (at the very least, he did not do anything that is visible to the viewer). *See*

Corrigan Squad Car Video, Defs.' Ex. 17, at 1:08-55 (Dckt. No. 87-1).

That said, there are simply too many disputed facts for the Court to grant summary

judgment. Under Pryor's version of the facts – where he was not resisting, posed little danger,

and was struck twice in the face by Corrigan's fist, once while he was handcuffed – a reasonable

jury could find that Officer Corrigan used excessive force when he punched Pryor, and Officer

Corrigan would not be entitled to qualified immunity. By 2015, when the arrest occurred, it was

"well-established that police officers cannot continue to use force once a suspect is subdued."

*See Boothe*, 190 F. Supp. 3d at 799 (quoting *Becker v. Elfreich*, 821 F.3d 920, 928 (7th Cir.

2016)); *see also Abbott v. Sangamon Cty.*, 705 F.3d 706, 732 (7th Cir. 2013) ("[I]t was well-

established in 2007 that police officers cannot continue to use force once a suspect is subdued.").

Under Officer Corrigan's version of the facts – where Pryor was resisting the whole time, where Corrigan used his forearm and his palm rather than his fist to strike Pryor, and where Pryor was not fully handcuffed during the second strike – a jury could conclude that both strikes were necessary to get Pryor under control, and Officer Corrigan might be entitled to qualified immunity.

In light of the factual dispute, there is a genuine issue of material fact about whether Pryor continued to resist Officer Corrigan, thus justifying additional force to subdue him. The Court denies both motions for summary judgment on this issue.

### 3.    Officer Corrigan's Gun

Finally, there is a question of fact about whether Officer Corrigan drew his gun during the encounter. But there is not a *genuine* issue of fact.

Pryor testified that Officer Corrigan had his gun drawn while he stepped out of his squad car and then ran towards Pryor to tackle him. *See* Pl.'s Statement of Facts, at ¶ 26 (Dckt. No. 98). On the other hand, Officer Corrigan testified that he never unholstered his gun. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 26 (Dckt. No. 124). Defendants also point to the video, which they claim shows that while Corrigan was running, "Officer Corrigan's hands were empty and he did not have his gun raised." *Id*.

If Officer Corrigan did, in fact, point his firearm at Pryor, that act would add another layer to the excessive force analysis. *See, e.g.*, *Baird*, 576 F.3d at 346 ("[W]hile police are not entitled to point their guns at citizens when there is no hint of danger, they are allowed to do so when there *is* reason to fear danger.") (emphasis in original); *Williams v. City of Champaign*, 524 F.3d 826, 828 (7th Cir. 2008) (acknowledging that when a police officer is approaching a car with possibly armed occupants, "you approach with utmost caution, which may include pointing

34

a gun at the occupants"); *but see Martin v. City of Fort Wayne*, 2017 WL 131724, at *6 (N.D. Ind. 2017) ("It is true that '[p]ointing a loaded gun at [a citizen] is a display of deadly force because it creates more than a remote possibility of death.'") (citation omitted).

But here, the video is clear. The dashcam video from Officer Corrigan's own vehicle plainly shows him exit his car and run towards Pryor. *See* Corrigan Squad Car Video, Defs.' Ex. 17, at 1:00-10 (Dckt. No. 87-1). He enters the frame at 1:01. *Id.* He is running away from the car, so the view is not perfect, but there appears to be nothing in his hands. He also appears to be running at full speed, pumping both arms (which would be dangerous if he were holding a weapon). *Id.* at 1:00-04. And his gun appears to be in its holster, on his right hip. *Id.* At 1:03, he leaves the frame of his own dashcam, *id.*, and enters the frame of Officer Isaak's dashcam. *See* Isaak Squad Car Video, Ex. 18, at 0:56 – 1:05 (Dckt. No. 88-1).

When Corrigan enters the frame, the viewer gets a good look at Corrigan's hands. They are empty. *Id.* He grabs and tackles Pryor without anything in his hands. *Id.* In light of the video evidence, no reasonable jury could find that Officer Corrigan's gun was drawn. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

In sum, the Court grants Defendants' motion for summary judgment in part, and denies it in part, on the excessive force claim. The Court denies Plaintiff's motion for summary judgment on the excessive force claim. The Court concludes that the tackle, which can clearly be seen in the video, is protected by qualified immunity, and that no reasonable jury could find that Officer Corrigan drew a gun. However, a jury must determine whether the two punches amounted to an excessive use of force.

### B.      Failure to Intervene and Failure to Supervise Claims

Pryor also claims that the other individual defendants failed to intervene in the excessive

force.  *See* Cplt., at ¶ 39 (Dckt. No. 1).  He also alleges that three of those officers – Ahlgren,

Hinterlong, and Weeks – were liable as supervisors.  *Id*. at ¶ 40.  Only Defendants have moved

for summary judgment on this issue.  *See* Pl.'s Mtn. for Partial Summ. J., at ¶ 3 (Dckt. No. 97).

The Court addresses both claims in turn.

### 1.      Failure to Intervene

To be liable for failure to intervene, each officer must have had a realistic opportunity to

intervene.  "An officer who is present and fails to intervene to prevent other law enforcement

officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer

had reason to know:  (1) that excessive force was being used, (2) that a citizen has been

unjustifiably arrested, or (3) that any constitutional violation has been committed by a law

enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm

from occurring."  *See Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (emphasis in original)

(citing *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994)).  The responsibility to intervene

extends to both supervisory and non-supervisory roles.  *Id.* at 285.

The Court concludes that no reasonable jury could find that any of the other ten officers

had an opportunity to intervene at any point.  Pryor claims that Officer Corrigan used excessive

force by tackling him, holding him on the ground, and striking him twice.  *See* Pl.'s Resp. to

Defs.' Mtn. for Summ. J., at 10 (Dckt. No. 110).  Those actions occurred within a span of about

forty seconds.  *See* Corrigan Squad Car Video, Defs.' Ex. 17, at 1:00-39 (Dckt. No. 87-1).

Eight of the ten officers had no opportunity to intervene because they weren't even there.

There is no evidence that Officers Cantona, McNeff, Cornforth, Rios, Bonnie, Ahlgren,

Hinterlong, or Weeks were on the scene when those actions took place. *Id.*; Isaak Squad Car Video, Ex. 18, at 0:40 – 2:00 (Dckt. No. 88-1); Pl.'s Statement of Facts (Dckt. No. 98) (offering no evidence that the other officers were in a position to intervene); Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 27–34 (Dckt. No. 108). If they weren't there, they had no "realistic opportunity to intervene to prevent the harm from occurring." *Yang*, 37 F.3d at 285.

Only two other officers, Officers Isaak and Christoffel, were on the scene during those two minutes. But neither of them had a reasonable opportunity to intervene, either. The video clearly shows Officer Isaak chasing another one of the van's passengers, and Officer Christoffel followed him. *See* Corrigan Squad Car Video, Defs.' Ex. 17 (Dckt. No. 87-1). As Defendants point out, there is no evidence that Officer Christoffel or Officer Isaak were even aware of excessive force used against Pryor. *See* Defs.' Mem. in Supp. of Mtn. for Summ. J., at 7 (Dckt. No. 86). They were running down the block, chasing someone else, so they had no realistic opportunity to intervene.

Therefore, the Court grants Defendants' motion for summary judgment with respect to all officers.

### 2. Failure to Supervise

Pryor also filed claims against three officers under a "failure to supervise" theory.

Section 1983 "'does not allow actions against individuals merely for their supervisory role of others.'" *Doe v. Purdue Univ.*, 928 F.3d 652, 664 (7th Cir. 2019) (quoting *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000)). Instead, to be liable, a supervisor "'must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye.'" *Id.* (citation omitted).

Even if there were constitutional violations, the evidence does not support such a finding that Officers Ahlgren, Hinterlong, or Weeks were in a position to know about and facilitate the conduct. Indeed, Officer Ahlgren arrived on the scene after Officer Corrigan had already arrested and handcuffed Pryor. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 27 (Dckt. No. 108). Officers Hinterlong and Weeks were never on the scene at all. *Id.* at ¶¶ 31, 34.

Defendants' motion for summary judgment for failure to supervise on the excessive force claim is granted with respect to all three defendants. Pryor's excessive force claim will proceed to trial *only* on the issue of whether Officer Corrigan used excessive force when striking Pryor twice while he was on the ground.

### III. Illegal Searches (Count III)

Next, Pryor brings an illegal search claim under the Fourth Amendment against eight of the officers. Once again, each side moved for summary judgment. Plaintiff moved for summary judgment against only Officers Corrigan and Cantona. Defendants moved for summary judgment as to all eight officers.

Pryor testified that he was searched three times. First, he testified that when he was on the ground, after he had been tackled, Officer Corrigan "pulled down Pryor's gym shorts and sweatpants, leaving Pryor exposed with only his boxer briefs on," and that Officer Corrigan put his hand "into Pryor's underwear in between Pryor's buttocks." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 40 (Dckt. No. 108). The video captures that search. *See* Corrigan Squad Car Video, Defs.' Ex. 17, at 2:04 – 4:23 (Dckt. No. 87-1) (offering a better view); Isaak Squad Car Video, Defs.' Ex. 18, at 1:57 – 4:20 (Dckt. No. 88-1) (showing the search in the bottom corner of the frame).

Second, Pryor testified that after Officer Corrigan helped him up, and he was standing, the officer "put his hand in front of Pryor's underwear and touched his genitals." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 41 (Dckt. No. 108). The video captures that search, too, although Officer Corrigan and Pryor are facing away from the dashcam, so the view is less than perfect. *See* Corrigan Squad Car Video, Defs.' Ex. 17, at 4:35 – 9:18 (Dckt. No. 87-1).

Finally, he testified that when he was in the back of the transport van, Officer Cantona "put his hands over plaintiff's underwear between Pryor's buttocks and then squeezed Pryor's genitals over his underwear, and said 'I feel it, I feel it. It's falling, it's falling' while searching." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 43 (Dckt. No. 108). Pryor also testified that during that search, Officer Cantona "squeezed his testicles so hard through plaintiff's underwear that plaintiff nearly lost consciousness." *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶¶ 45–46 (Dckt. No. 124). Pryor argues that all three searches were unreasonably invasive because they involved touching his crotch area, and that the third search involved an excessive use of force. That alleged search, unlike the other two, is not on video.

Like the excessive force claim, Pryor alleges that Officers Corrigan and Cantona are responsible for the illegal conduct, and that the remaining officers are liable for failure to intervene or failure to supervise. So the Court analyzes the claims against those two officers first. The Court analyzes whether the three searches are constitutional, and whether any party is entitled to summary judgment on those claims, before turning to the other claims against the other officers.

## A.     Intrusiveness & Excessive Force

Before any search took place, the police lawfully arrested Pryor. During a lawful arrest, a police officer may conduct a "search incident to arrest." *United States v. Robinson*, 414 U.S.

39

218, 234 (1973). It is a "bright line rule" that when an officer performs a search incident to arrest, the officer is "allowed to and should thoroughly search suspects' clothing and bodies . . . even if they do not suspect at the time that the person is armed or carrying contraband for the protection of themselves and others." *See United States v. Brown*, 233 F. App'x. 564, 568 (7th Cir. 2007); *see also Robinson*, 414 U.S. at 227 (explaining that an officer can conduct a "relatively extensive exploration of the person" during a search incident to arrest). A search incident to arrest can include the arrestee's groin area. *See*, *e.g., Brown*, 233 F. App'x. at 568–69.

A search of an arrestee's body, including his groin area, during a search incident to arrest is "unreasonable" in violation of the Fourth Amendment when it is conducted in a manner that is "extreme or patently abusive." *Campbell v. Miller*, 499 F.3d 711, 717 (7th Cir. 2007) (quoting Robinson, 414 U.S. at 236); *see also Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1270–73 (7th Cir. 1983) (holding that a search incident to arrest may not be extreme or abusive).

Courts in this Circuit have found that a search of a suspect's crotch area was "extreme or patently abusive" in at least three circumstances. *Campbell*, 499 F.3d at 717. But they are illustrative, not exhaustive.

First, a search is unreasonable when it is conducted "for sexual gratification or to humiliate" the arrestee, rather than for a proper purpose. *See Ragland v. City of Milwaukee*, 104 F. Supp. 3d 958, 967 (E.D. Wis. 2015).

Second, a search is unreasonable when the suspect's private parts are exposed to onlookers. *See Brown*, 233 F. App'x. at 568–69 ("A search of the private areas of a suspect's body is reasonable if the suspect's private parts are not exposed to onlookers."); *Maldonado v. Pierri*, 2010 WL 431478, at *7 (N.D. Ill. 2010) ("[T]he Seventh Circuit has held that the search

of a suspect's crotch area incident to arrest is reasonable if the search is calculated to uncover evidence or a weapon and the suspect's private parts are not exposed to the public.").

Finally, a search is unreasonable when an officer conducts a "strip search" or a "body cavity search" without reasonable suspicion that they will discover evidence or weapons. *See Mary Beth G.*, 723 F.2d at 1273 ("[E]nsuring the security needs of the City by strip searching plaintiffs-appellees was unreasonable without a reasonable suspicion by the authorities that either of the twin dangers of concealing weapons or contraband existed."); *see also Swain v. Spinney*, 117 F.3d 1, 5 (1st Cir. 1997) ("A strip and visual body cavity search of an arrestee must be justified, at the least, by a reasonable suspicion."); *Sloley v. VanBramer*, 945 F.3d 30, 33 (2d Cir. 2019) (same). As their names imply, a "strip search" occurs when a suspect "is required to remove his clothes." *Sloley*, 945 F.3d at 36–37; A "visual body cavity search" takes place when the police "observe the suspect's body cavities without touching them (as by having the suspect to bend over, or squat and cough, while naked." *Id.* And a "manual body cavity search" occurs when the police "put anything into a suspect's body cavity, or take anything out." *Id.*

A search can be unreasonable for another reason, too. The Fourth Amendment precludes an "unreasonable" search, and that prohibition includes excessive force. *See* U.S. Const. amend IV; *Los Angeles County, Calif. v. Rettele*, 550 U.S. 609, 614 (2007); *Graham*, 490 U.S. at 396; *Turner v. City of Champaign*, 979 F.3d 563, 567 (7th Cir. 2020).

The test for excessive force during a search is the same as the test for excessive force generally. *See Ragland*, 104 F. Supp. 3d at 967; *Price v. Kramer*, 200 F.3d 1237, 1249 (9th Cir. 2000). As discussed above, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

Applying those principles here, a jury could find that only the third search violated the Fourth Amendment.

### 1. The First Search

Pryor testified that during the first search, while Officer Corrigan was on top of him, the officer "pulled down Pryor's gym shorts and sweatpants, leaving Pryor exposed with only his boxer briefs on," then put his hand into Pryor's underwear to search his crotch area. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 40 (Dckt. No. 108).

Pryor has not come forward with sufficient evidence to support a jury verdict that the first search violated the Fourth Amendment. First, there is no indication that Officer Corrigan performed that search for an improper purpose (*e.g.,* to humiliate Pryor, or for sexual gratification).

Second, there is no indication that Pryor's private parts were exposed to the public during that initial search. Although his boxers might have been exposed, there is no evidence that his skin was exposed. Pryor testified that the first search caused his pants to "loosen until they were around his knees or his ankles." *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 39 (Dckt. No. 124). But he did not testify that his skin was exposed. *See Maldonado*, 2010 WL 431478, at *2, *7 (pulling down a suspects pants a few inches while searching his crotch area did not count as exposing his private parts); *Ragland*, 104 F. Supp. 3d at 967 (requiring a suspect to pull down his jeans, revealing basketball shorts, while the officer searched his crotch area did not count as exposing his private parts). The video did not capture an exposure of any private areas of Pryor's body.

Finally, there is no indication that this search amounted to a strip search or a body cavity search. The search was not unusually invasive.

In sum, there is no factual support in the record for the notion that the first search was abusive or extreme. At most, Pryor testified that the officer searched his groin area during the first search. But that fact, standing alone, is not enough to support a claim. As a result, based on the record, a reasonable jury could not find that the first search violated the Fourth Amendment.

### 2. The Second Search

Next, Pryor testified that, after Officer Corrigan helped him off the ground, the officer conducted a second search and "put his hand in the front of Pryor's underwear and touched his genitals." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 41 (Dckt. No. 108).

Again, the record could not support a jury verdict that the second search violated the Fourth Amendment. There is no indication that the second search was conducted to humiliate Pryor or for sexual gratification. There is no evidence that his private parts were exposed to the public, or that the search was a strip search or a body cavity search. There is no evidence that the second search inflicted gratuitous harm, or caused Pryor to suffer any physical pain. And there is no indication that the search was otherwise extreme or patently abusive.

### 3. The Third Search

The result is different for the third search. There is a genuine issue of material fact about whether Officer Cantona violated Pryor's rights under the Fourth Amendment.

Pryor testified that Officer Cantona conducted a third search while he was at the back of the transport van (as an aside, the statements don't make it clear whether he was *in* the back of the transport van, or *near* the back of the transport van). *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶¶ 45–46 (Dckt. No. 124); *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 42 (Dckt. No. 108). Only the driver of the transport vehicle (Officer Rios) was present during the alleged search, and Officer Cantona did not take off any of Pryor's clothing. *See id.*

Pryor testified that Cantona "put his hands over plaintiff's underwear between Pryor's buttocks and then squeezed Pryor's genitals over his underwear." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 43. During the search, Cantona said, "I feel it, I feel it. It's falling, it's falling." *Id.* Pryor testified that "defendant Cantona reached into plaintiff's pants and squeezed his testicles so hard through plaintiff's underwear that plaintiff nearly lost consciousness." *See* Pl.'s Statement of Facts, at ¶ 45 (Dckt. No. 98).

Officer Cantona, for his part, denies that the third search took place. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 46 (Dckt. No. 124). Officer Cantona testified that he never searched Pryor at all, let alone squeezed his private area. *Id.* Officer Rios was on the scene, but never saw Officer Cantona search Pryor. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 33 (Dckt. No. 108).

Pryor has come forward with sufficient evidence to get to a jury on his claim about the alleged search by Officer Cantona. Needless to say, squeezing testicles is "extreme or patently abusive" conduct. *Campbell*, 499 F.3d at 717. To put it mildly, it is highly intrusive to squeeze the most sensitive part of the male anatomy. If exposing the groin area to public view is unduly intrusive, *see Brown*, 233 F. App'x. at 568–69, then surely the conduct that Pryor described is, too. It's also a hornbook example of excessive force. *See Price v. Kramer*, 200 F.3d 1237, 1249 (9th Cir. 2000) ("Regardless of any legal justification for a pat-down search, the police officers could not be justified in causing the boys extreme pain by deliberately grabbing, pulling, and squeezing their testicles.") (citing *Graham*, 490 U.S. at 396–97). Squeezing a sexual organ is about as close as one could come to a *per se* unreasonable search. It isn't a search for anything – it is simply a gratuitous infliction of pain to a highly sensitive part of the body.

44

Further, under Pryor's version of the facts, the officers would not be entitled to qualified immunity. Other appellate courts have held that an arrestee's right not to have an officer painfully squeeze their crotch area during an arrest without justification is clearly established. *See, e.g., Price*, 200 F.3d at 1249 ("Regardless of any legal justification for a pat-down search, the police officers could not be justified in causing the boys extreme pain by deliberately grabbing, pulling, and squeezing their testicles. The plaintiffs provided the jury with sufficient evidence to support the conclusion that the officers had engaged in this conduct—conduct that clearly lies outside the protective realm of qualified immunity.") (citations omitted). And courts in this district have denied summary judgment when police used unnecessary force to conduct searches.

For example, in *Griffin v. Filipiak*, 2002 WL 1972272, at *4 (N.D. Ill. 2002), the plaintiff was recovering from a broken jaw when officers forced his mouth open to look for drugs. The plaintiff had informed officers of his jaw injury, but they proceeded to search his mouth, injuring his already fragile jaw. The court applied the *Graham* test to the search, taking the disputed facts in Plaintiff's favor, and concluded that there could have been a constitutional violation in the circumstances (but leaving the conclusion for trial, as the disputed facts precluded summary judgment). *Id.* at *5. As the *Griffin* court noted, "[a]n individual's right to preserve his/her bodily integrity, health, and safety may outweigh the justification for using a certain amount of force to preserve possible evidence of a crime." *Id.* at *5.

In sum, a reasonable jury could find that the third search violated Pryor's Fourth Amendment rights, and Officer Cantona would not be entitled to qualified immunity. *See Strand v. Minchuk*, 910 F.3d 909, 919 (7th Cir. 2018); *see also Griffin*, 2002 WL 1972272, at *7 ("[T]his Court has held that summary judgment based on qualified immunity is not proper when

45

the question of immunity turns on issues of disputed fact."). Therefore, Plaintiff's motion for summary judgment and Defendants' motion for summary judgment on the third search are denied.

### 4. Summary

In sum, the Court grants Defendants' motion for summary judgment on the first two searches (by Officer Corrigan), and denies Plaintiff's motion for summary judgment on those searches. The Court denies both motions for summary judgment on the third search (by Officer Cantona).

### B. The Search Claims Against Other Defendants

As before, Pryor has brought failure to intervene claims against six other officers, alleging that they should have intervened in the searches by Officers Corrigan and Cantona, and against Officers Corrigan and Cantona for the searches they did not personally perform. As discussed in previous sections, "[a]n officer who is present and fails to intervene to prevent other law enforcement officers from infringing constitutional rights of citizens is liable under § 1983 if he had reason to know of a constitutional violation has been committed *and* a realistic opportunity to intervene to prevent the harm from occurring." *Simmons v. City of Chicago*, 2017 WL 635144, at *8 (N.D. Ill 2017) (citing *Yang v Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)) (emphasis in original).

All six of the officers as well as Officer Cantona are entitled to summary judgment with respect to the first two searches (performed by Officer Corrigan) because the Court has concluded that the first two searches were constitutional. There was no constitutional violation to prevent.

All six officers are also entitled to summary judgment with respect to the third search (performed by Officer Cantona) as well as Officer Corrigan. Only one officer, Officer Rios, was in the vicinity. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 33 (Dckt. No. 108). The other officers weren't in the area, so they weren't in a position to intervene. *See* Corrigan Squad Car Video, Defs.' Ex. 17 (Dckt. No. 87-1); Isaak Squad Car Video, Defs.' Ex. 18 (Dckt. No. 88-1); Pl.'s Statement of Facts (Dckt. No. 98) (offering no evidence that the other officers were in a position to intervene); Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 27 – 32, 34 (Dckt. No 108) (admitting that the other defendants were not in a position to intervene). If they weren't in a position to intervene, they can't be liable for a failure to intervene.

The evidence against Officer Rios (again, the driver of the transport van) is lacking, too. There is no evidence that Officer Rios saw or knew about the search. Officer Rios testified that he "never saw Officer Cantona searching Pryor." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 33 (Dckt. No. 108). While Pryor disputes this fact, there is no evidence to support a finding that Rios was both aware of the search *and* had an opportunity to intervene. *Id.* Defendants' motion for summary judgment on the failure to intervene in the search claims is granted.

Pryor's unreasonable search claim will proceed to trial *only* on the issue of whether Officer Cantona used excessive force when allegedly searching Pryor in the back of the transport van.

## IV. Battery (Count IV)

Pryor also brings state law claims for battery against eight officers. The parties filed cross motions for summary judgment. Plaintiff moved for summary judgment against Officers

Corrigan and Cantona, as well as the City of Aurora. Defendants moved for summary judgment as to all defendants.

Unlike Pryor's other claims, where he alleged that a single officer took a direct action that harmed him, and the other officers were liable for failure to intervene or failure to supervise, Pryor is suing all eight officers *directly* on the battery claim. He is not suing anyone on a theory of failure to intervene, or failure to supervise. He alleges that all eight officers committed battery.

Specifically, Pryor alleges that Officer Corrigan committed a battery during the arrest and the two searches. He also claims that Officer Cantona committed a battery during the search in the back of the transport van. But it's not clear what, if anything, he thinks the other officers did that would constitute a battery.

Under Illinois law, a person "commits a battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." *See* 720 ILCS 5/12-3(a).

However, as Defendants point out, the officers' conduct is protected by the Illinois Tort Immunity Act unless it was "willful" or "wanton." *See* 745 ILCS 10/2–202 ("A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct."). The Act defines willful and wanton conduct as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." *See id.* at 10/1-210.

The Seventh Circuit has ruled that the actions of a public employee cannot be willful and wanton if they were "objectively reasonable" under the Fourth Amendment. *See Horton v.*

48

*Pobjecky*, 883 F.3d 941, 954 (7th Cir. 2018) (affirming the district court's holding that, since the officer's actions were objectively reasonable, "they cannot be willful and wanton"). The Tort Immunity Act protects an employee's objectively reasonable actions. *See Kapernekas v. Vill. of State Park*, 2019 WL 1543261, at *6 (N.D. Ill. 2019). Courts in this district have applied this concept to dismiss Illinois battery cases, like Pryor's, where the public employee's actions were objectively reasonable under the Fourth Amendment. *Id.* (collecting cases).

The Court begins with the claims against Officer Corrigan.

The Court has concluded that all of Officer Corrigan's actions except the two strikes were either objectively reasonable or protected by qualified immunity, including the tackle and the two searches. Therefore, those actions cannot be willful and wanton as defined by the Illinois Tort Immunity Act.

However, the Court denied Defendants' motion for summary judgment about three physical acts: the two blows delivered by Officer Corrigan, and the squeeze during the search by Officer Cantona. There is evidence on each side of the ledger, so it must go to a jury. The same result applies to those acts when the claim is battery. Therefore, the battery claims against Officers Corrigan and Cantona survive to the extent that they involve the strikes and the squeeze.

Defendants' motion for summary judgment with respect to the other defendants is granted. The complaint alleges that eight officers – Officers Corrigan and Cantona, plus six others – had "physical contact" with Pryor. *See* Cplt., at ¶ 48 (Dckt. No. 1). But there is no evidence in the record any other defendant touched Pryor, let alone did so in an offensive manner. The battery claim against the City of Aurora is addressed below.

## V.    Malicious Prosecution (Count V)

Pryor also brings a malicious prosecution claim under both federal and state law against all eleven officers, as well as the City of Aurora.  Once again, the parties filed cross motions for summary judgment.

### A.    Federal Law

The complaint expressly invokes federal law in the malicious prosecution count.  *See* Cplt., at ¶ 58 (Dckt. No. 1) (alleging that Pryor was "deprived of rights, privileges, and immunities secured to him by the Fourth and Fourteenth Amendments to the Constitution of the United States").  But in his brief, Pryor explained that he never intended to make a malicious prosecution claim under federal law.  "Plaintiff is pursuing his constitutional right not to be held [sic] in custody without probable cause, not a 'federal malicious prosecution' claim."  *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 16 (Dckt. No. 110).

The concession was unavoidable, because a malicious prosecution claim under federal law was doomed to fail.  "[I]t is well-established that the Seventh Circuit does not recognize malicious prosecution claims under § 1983."  *Lund v. City of Rockford*, 2019 WL 1773354, at *4 (N.D. Ill. 2019); *Serino v. Hensley*, 735 F.3d 588, 593 (7th Cir. 2013) ("Remember, there is no such thing as a constitutional right not to be prosecuted without probable cause.").

The Court already concluded that the arrest was lawful, so the "malicious prosecution" claim is not a backdoor way to challenge the arrest.  And there is no federal claim for malicious prosecution.  Defendants' motion for summary judgment on the federal claim for malicious prosecution is granted.

### B.     State Law

Pryor also brought a malicious prosecution claim against all twelve defendants under state law.  Again, each side moved for summary judgment on this claim.  *See* Pl.'s Mem. in Supp. of Mtn. for Summ. J., at 15–17 (Dckt. No. 100); Defs.' Mem. in Supp. of Mtn. for Summ. J., at 11–15 (Dckt. No. 86).  And again, Officer Corrigan is the primary defendant.

### 1.     Claim Against Officer Corrigan

Under Illinois law, a malicious prosecution claim has five elements:  "(1) commencement or continuation of an original proceeding; (2) termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause; (4) malice; and (5) damages." *Cairel v. Alderden*, 821 F.3d 823, 834 (7th Cir. 2016) (citing *Sang Ken Kim v. City of Chicago*, 368 Ill. App. 3d 648, 306 Ill. Dec. 772, 858 N.E.2d 569, 574 (2006)); *Swick v. Liautaud*, 169 Ill. 2d 504, 215 Ill. Dec. 98, 662 N.E.2d 1238, 1242 (1996) (citation omitted).  A plaintiff must come forward with evidence to satisfy each element.  *See Cairel*, 821 F.3d at 834 (citation omitted); *see also Swick*, 662 N.E.2d at 1242–43.

Defendants argue that Pryor has no evidence to support three of the five elements.  *See* Defs.' Mem. in Supp. of Mtn. for Summ. J., at 11–15 (Dckt. No. 86).  Specifically, they argue that the criminal case did not end in favor of Pryor (element #2), they did have probable cause (element #3), and they did not act with malice (element #4).  *Id.*

The Court begins with element three – the lack of probable cause.  "For a malicious prosecution claim, probable cause is determined based upon the facts known to the prosecution at the time of filing, 'not the actual facts of the case or the guilt or innocence of the accused.'" *See Cairel*, 821 F.3d at 834 (quoting *Sang Ken Kim*, 858 N.E.2d at 574).  Probable cause is "only a probability or substantial chance of criminal activity, not a certainty that a crime was

committed." *Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003) (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)).

The Court has already found that Officer Corrigan had probable cause to arrest Pryor. Only a few hours passed between Pryor's arrest and subsequent charging on March 23, 2015. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 14 (Dckt. No. 124) (admitting that the incident took place in the early evening); *id.* at ¶ 48 (admitting that the police took Pryor to the police station and charged him that day); *see also* Defs.' Ex. 14 (Dckt. No. 85-14) (criminal complaint dated March 23, 2015). Pryor doesn't identify any evidence from that window of time that would have caused the prosecution to doubt that there was probable cause to charge him with obstructing or resisting a peace officer under 720 ILCS 5/31-1. Probable cause existed for Officer Corrigan to arrest Pryor; based on those same facts, Officer Corrigan charged Pryor with resisting or obstructing a peace officer.

Similarly, the record lacks any evidence of malice in charging Pryor (element four). Plaintiff's sole argument for malice is that "[m]alice may be inferred where, as here, police officers arrest and commence or continue charges without probable cause." *See* Pl.'s Mem. in Supp. of Mtn. for Summ. J., at 16 (Dckt. No. 100) (citing *Turner v. City of Chicago*, 91 Ill. App. 3d 931, 937 (1980)). Again, probable cause existed here, so his argument for malice fails, too.

Finally, Pryor has not come forward with evidence that the criminal proceeding terminated in his favor (element two). "The plaintiff has the burden of proving a favorable termination." *See Washington v. Summerville*, 127 F.3d 552, 557 (7th Cir. 1997). A decision to drop the charges isn't enough. He must provide evidence that the state dropped the charges in a manner "indicative of [his] innocence." *Id.* ("In order to fulfill the second element, a plaintiff

cannot predicate his malicious prosecution action on underlying criminal proceedings which were terminated in a manner not indicative of the innocence of the accused.").

In support of his motion for summary judgment, Pryor relies on the prosecution's decision to enter a *nolle prosequi*. *See* Pl.'s Statement of Facts, at ¶ 52 (Dckt. No. 98). Defendants suggest that the prosecution entered the *nolle prosequi* in connection with Pryor's plea agreement on a separate charge. *See* Defs.' Mem. in Supp. of Mtn. for Summ. J., at 12 (Dckt. No. 86). Pryor disputes that characterization and instead asserts that "the abandonment of this charge was indicative of plaintiff's innocence, as it was not part of plaintiff's plea deal relating to another case." *See* Pl.'s Mem. in Supp. of Mtn. for Summ. J., at 16 (Dckt. No. 100).

But a *nolle prosequi*, without more, is not enough. The plaintiff "bears the burden of showing that the *nolle prosequi* was entered for reasons consistent with his innocence." *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001); *Swick*, 662 N.E.2d at 1242); *see also Washington*, 127 F.3d at 557 ("The plaintiff meets his burden of proof only when he establishes that the *nolle prosequi* was entered for reasons consistent with his innocence.").

Pryor has not met this burden because he has not shown any reason for the entry of the *nolle prosequi*, let alone that such reason compels the conclusion that he is innocent. *See Logan*, 246 F.3d at 925 ("This burden will only be met if the plaintiff establishes that '[t]he circumstances surrounding the abandonment of the criminal proceedings . . . compel an inference that there existed a lack of reasonable grounds to pursue the criminal prosecution.") (quoting *Swick*, 662 N.E.2d at 1243). He only argues that a separate plea agreement was *not* the reason for the *nolle prosequi*, not that the real reason was his innocence. And the state court's order, which Pryor submitted, does not provide a reason for the prosecution dropping the case, either.

*See* 10/24/16 Circuit Court Order (Dckt No. 99-2) (indicating a "nolle pros" without any detail, and stating Pryor was "released on this case").

In the end, Plaintiff has evidence that the state dropped the charges. But Plaintiff did not come forward with evidence that the state dropped the charges because he was innocent. So Plaintiff has not come forward with evidence to support this element of the claim. *See Washington*, 127 F.3d at 558 ("A bare nolle prosse without more is not indicative of innocence. Lack of a recorded reason for the nolle prosequi offers no insight as to the validity or invalidity of [plaintiff's] position.").

The Court grants Defendants' motion for summary judgment on Pryor's state law malicious prosecution claim in Count V. The Court denies Plaintiff's motion for summary judgment on that count.

### 2.    Claim Against Other Defendants

Plaintiff has not come forward with evidence to support a malicious prosecution claim against Officer Corrigan. So the other Defendants cannot be liable on a theory of failure to intervene or failure to supervise. Therefore, the Court grants Defendants' motion for summary judgment on the malicious prosecution claim with respect to all individual defendants, and denies Plaintiff's motion.

## VI.    Claims Against the City of Aurora (Counts IV, V, VI)

In addition to the claims against the officers, Pryor also brings three claims against the City of Aurora: battery, malicious prosecution, and indemnification. Defendants moved for summary judgment on two of those claims, battery and malicious prosecution. Plaintiff did not move for summary judgment on any claims against the City of Aurora.

Pryor is suing the City for battery and malicious prosecution on a theory of *respondeat superior.* Under this theory, the employer is "held vicariously liable for its employees' acts that are committed within the scope of their employment." *Prate v. Vill. of Downers Grove*, 2011 WL 5374100, at \*5 (N.D. Ill. 2011) (citation omitted). *Respondeat superior* is a theory of derivative liability. *Id.* (citing *Sperl v. C.H. Robinson Worldwide, Inc.*, 408 Ill. App. 3d 1051, 349 Ill. Dec. 269, 946 N.E.2d 463, 473 (2011)).

The claim against the City for battery survives to the extent that it survives against the individual defendants: Officer Corrigan's two punches and Officer Cantona's search. Otherwise, Defendants' motion is granted.

The Court has concluded that there was no underlying violation for malicious prosecution, so the Court also grants Defendants' motion for summary judgment on that claim against the City of Aurora. The City cannot be held vicariously liable when its employees are not liable. *See* 745 ILCS 10/2-109 ("A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable."); *see also Prate*, 2011 WL 5374100, at \*6. *Respondeat superior* involves derivative liability, so if the employees are not liable, then there is nothing for the City of Aurora to be vicariously liable *for.*

## Conclusion

The Court grants Defendants' motion for summary judgment [83] on the claims for false arrest (Count I) and malicious prosecution (Count V). Defendants' motion for summary judgment is granted in part on the claim for excessive force (Count II), illegal search (Count III), and battery (Count IV). Pryor's excessive force claims (Count II) against Officer Corrigan can proceed to trial with respect to the two punches, and the illegal search claim (Count III) can proceed as it relates to Officer Cantona's search of Pryor. The battery claim (Count IV) against

Officers Corrigan and Cantona, as well as the City of Aurora, can proceed to trial with respect to both of those incidents (*i.e.,* the two punches, and the third search). Count VI (the indemnification count against the City of Aurora) can proceed to trial in its entirety.

The Court denies Plaintiff's cross motion for summary judgment [97] in its entirety.


Date:   March 30, 2021

_____
Steven C. Seeger
United States District Judge